```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
UNITED STATES OF AMERICA                  :
                                          :
            -v-                           :       22cr636 (DLC)
                                          :
ADRIAN NUNEZ,                             :       OPINION AND
                        Defendant.        :          ORDER
                                          :
                                          :
----------------------------------------- X
```

APPEARANCES:

For the United States of America:
Jeffrey W. Coyle
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007

For the defendant:
Christopher A. Flood
Federal Defenders of New York, Inc.
52 Duane Street, 10th Floor
New York, New York 10007

DENISE COTE, District Judge:

The defendant has moved to suppress Adrian Nunez's post-arrest statements and a witness identification of the defendant. For the following reasons, the motion is denied.

## Background

On four separate occasions in May of 2022, Molotov cocktails were thrown against a building in the Bronx.  On May 14, a fire marshal with the Fire Department of the City of New York showed surveillance footage to a witness, who identified

the defendant.  On May 24, the defendant was charged in a criminal complaint with arson.  On May 25, the defendant was arrested and interrogated by members of an ATF task force.

On November 21, 2022, the defendant was indicted for arson and unlawful possession of a destructive device, in violation of 26 U.S.C. §§ 5861(d) and 5871.  Following competency proceedings and the defendant's restoration to competency, a trial date of November 12, 2024 was set.

On July 18, 2024, the defendant filed the instant motion. The Government opposed the motion on July 25.

## Discussion

The defendant's motion to suppress his post-arrest interview will be addressed first.  The motion to address the witness identification will be addressed last.

I.   Post-Arrest Interview

The defendant contends that he clearly and conclusively invoked his right to counsel and that, in violation of his Miranda rights, law enforcement agents continued to question him.  He seeks to suppress any statements that he made following that invocation.

The Fifth and Fourteenth Amendments to the U.S. Constitution require that custodial interrogation be preceded by advice that the person has the right to remain silent and also

2

has the right to the presence of an attorney. Edwards v. Arizona, 451 U.S. 477, 481-82 (1981). Once Miranda warnings have been properly administered, a defendant is left to make his own choice as to how best to proceed. United States v. Plugh, 648 F.3d 118, 125 (2d Cir. 2011). Law enforcement officers must immediately cease questioning a suspect, however, when he clearly asserts his right to have counsel present during a custodial interrogation. Edwards, 451 U.S. at 485. Where a clear assertion of that right has been made, a valid waiver of the right to counsel "cannot be established by showing only that [the defendant] responded to further police-initiated custodial interrogation." Id. at 484. Where the person has expressed a desire to deal with the police "only through counsel", the person may not be subject "to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85. Indeed, readvising a person of their Miranda rights and obtaining a second waiver of those rights is insufficient to permit further custodial interrogation. Id. at 487. This "second layer of prophylaxis for the Miranda right" is designed to "prevent police from badgering a defendant into waiving his previously

3

asserted Miranda rights." Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted).

Whether an accused has actually invoked his right to counsel "is an objective inquiry." Id. at 459. The accused "must unambiguously request counsel." Id. The accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. If the statement "fails to meet the requisite level of clarity", the officer need not stop questioning the suspect. Id. "[L]aw enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Id. at 461. As the Court of Appeals has explained, "absent an unambiguous invocation, custodial officers have no obligation to stop questioning or to ask only questions intended at clarifying an ambiguous statement." Plugh, 648 F.3d at 126. "Because it is police officers who must actually decide whether or not they can question a suspect, the law should avoid forcing them to make difficult judgment calls about whether the suspect in fact wants to invoke his rights, even though he has not expressly said so, with the threat of suppression if they guess wrong." Id. (citation omitted).

Statements such as "[m]aybe I should talk to a lawyer," Davis, 512 U.S. at 462, "[d]o you think I need a lawyer?", Diaz v. Senkowski, 76 F.3d 61, 63 (2d Cir. 1996), and "I don't know if I need a lawyer", Plugh, 648 F.3d at 121, do not constitute an unambiguous request for counsel.  Where a statement indicates indecision, for example, "I am not sure if I should be talking to you," or contemplation, it is too ambiguous to constitute an invocation of Miranda rights.  Id. at 125.

Instead, the individual "must speak clearly enough that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  Wood v. Ercole, 644 F.3d 83, 91 (2d Cir. 2011) (citation omitted).  In Wood, the Court of Appeals concluded that the invocation had been sufficiently clear when, having been asked if he would "go on video," the suspect responded, "I think I should get a lawyer." Id.

The defendant was taken into custody and interviewed on May 25, 2022, by three law enforcement officers.  The interview was videotaped.  It took place in a room where the defendant and officers were seated around a table.  The officers wore street clothes and no weapons were displayed during the interview.  The defendant sat in a relaxed position in his chair, leaning

5

against the adjacent wall and with one handcuffed arm resting on the table.

The parties agree that the defendant was properly advised of his rights and knowingly waived those rights. One of the agents slowly and clearly read the Miranda rights to the defendant, and after the defendant verbally acknowledged that he understood his rights, the agent gave him a form to sign to acknowledge that he understood his rights. The defendant signed the form. [3:21][1] There is no allegation that the officers coerced the defendant or used undue pressure to obtain a waiver of Miranda rights.

The interview lasted approximately 31 minutes after the waiver form was executed. It concluded abruptly when the defendant unambiguously invoked his right to counsel. [3:53:11]

After the defendant was advised of his Miranda rights, he raised on three separate occasions his right to speak to counsel. The parties' submissions focus on the first exchange, which the defendant contends was an unequivocal and unambiguous invocation of his right to counsel.

The following is the Court's transcript of the three relevant passages. The sound quality of the videotape and the

---

[1] The bracketed information indicates the time stamp on the videotape.

6

defendant's speech impediment make it difficult to understand everything the defendant says. Indeed, the videotape of the interview indicates that the officers had difficulty understanding him at times. It appears that the defendant was speaking without his dentures. As the defendant explains at one point, his dentures kept falling out and he had stored them in his pocket. [3:22:18]

Soon after the defendant was given his Miranda warnings and signed the waiver of rights, the following exchange occurred [3:21:30]:

> Officer 3[2]: So, Adrian, before we, before we dive in, I know [Officer 1] wants to speak to you about some things. Um, you UI[3] at Kimberly Place in the Bronx. When did you stop living there?
>
> Defendant: Say it again?
>
> Officer 3: When did you stop living there? Now that you're living in a shelter, or homeless, I'm sorry.
>
> Defendant: So, knowing my rights, I, I, you know what I am saying, respectfully, I can wait for a lawyer? You understand? I, I don't know how, how that works. You're saying that I don't have to answer any questions?
>
> Officer 3: Yes, yes, your rights are that you don't have to answer any questions without a lawyer present if you don't want to.

---

[2] Officer 3 refers to the officer seated at the end of the table; Officer 1 to the officer seated across from the defendant; and Officer 2 to the officer sitting between the other two officers.

[3] Unintelligible words are indicated by "UI".

>Defendant: Right, that's, that's what I'm saying UI.
>
>Officer 2: What?  Say it again.
>
>Defendant: I, I, I understand what you're, what you're.  You're asking me, um, why I had, why I had UI um, when was the last time I was there, was in October.
>
>Officer 3:  Well, you said that you were homeless. Now, you still lived there, I was asking your last known address.  You said,
>
>Defendant: October 2021.
>
>Officer 3: That's when you last lived in Kimberly?
>
>Defendant: Yeah.

Following this interaction, the officers continue their questioning.  Approximately fourteen minutes later, the defendant tells the officers that he flew his dog to his mother in Puerto Rico, and then interjects [3:34:25]

>Defendant: So I can get a lawyer at any time?
>
>Officer 1: At any time, you can, yes.  At any time you can.  One hundred percent.

Questioning continues, and then approximately nineteen minutes later an officer shows him evidence linking use of his metrocard to the incidents.  The officer expresses relief that no one got hurt and asks him to explain what he was trying to accomplish.  The defendant then invokes his right to counsel.

>Defendant: Can I get a lawyer?  [3:53:11]
>
>Officer 1:  Absolutely.

As this point, questioning ends.

8

The defendant argues that he clearly invoked his right to counsel in the first exchange [3:21:31], and that all questioning should have ceased at that point.  The parties' only material dispute concerns the highlighted passage below.

The defense transcribes the defendant's statement as follows:

> Defendant: So, knowing my rights, respectfully **I'll wait for a lawyer**.  You know what I'm saying?  I don't know how that works, you say I don't have to answer any questions.

The Government transcribes the passage as follows:

> Defendant: So, knowing my rights, I, I, you understand, respectfully, **I can wait for a lawyer**?  You understand?  I don't know how that works.  You said that I don't have to answer any questions?

The Government's transcription is more accurate.  It not only captures the words more accurately, but also accurately indicates that the defendant would have been understood to be asking questions by raising his voice at the end of sentences.  The Court's effort to capture the defendant's statements accurately, particularly at this point of the interview, appears above and is repeated here for ease of reference.

> Defendant: So, knowing my rights, I, I, you know what I am saying, respectfully, **I can wait for a lawyer?** You understand?  I, I don't know how, how that works.  You're saying that I don't have to answer any questions?

9

It must be acknowledged, however, that the defendant's speech is garbled and the audio quality of the tape is far from perfect. The defendant is speaking quickly and indistinctly. Each of these three transcriptions, however, shares several features. The defendant is addressing his right to remain silent until he has an opportunity to consult with a lawyer. He inquires if he has correctly understood that right. It is undisputed that an officer promptly and accurately confirms that he has understood that right correctly. Thereafter the plaintiff responds to the pending question, that is, when he last lived at the building at issue.[4]

The defendant's motion to suppress is denied. The defendant did not clearly and unambiguously invoke his right to counsel. A reasonable law enforcement officer would have

---

[4] Both parties also disagree about the response from the defendant after the officer confirms that the defendant has correctly understood his right to counsel. This dispute is not material to this motion but may be important at trial when evidence of the interview is offered into evidence. The defense writes:
> Defendant: I don't understand what you're saying. You're asking me when was the last time I lived there was October?

The Government offers a different transcription.
> Defendant: I understand what you're, you're asking me when was the last time I was [in the Building] was October.

understood the defendant to be inquiring about his right to counsel to confirm that he had correctly understood that right. A reasonable officer would not have understood the defendant to be invoking his right to counsel at that stage of the interview.

II. Identification

The defendant also seeks to suppress a witness's out of court identification of a picture of the arsonist on the ground that the identification was unreliable and the product of an unnecessarily suggestive procedure. This motion is also denied.

Due process "protects the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification." United States v. Diaz, 986 F.3d 202, 206-07 (2d Cir. 2021) (citation omitted). The linchpin of admissibility of identification testimony is reliability. Id. at 207.

Federal courts employ a two-step inquiry to determine the admissibility of a pretrial identification. The first inquiry "is whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Id. (citation omitted). If the procedures were not suggestive, the identification evidence "presents no due process obstacle to admissibility; no further inquiry by the court is required, and the reliability of properly admitted eyewitness identification,

11

like the credibility of the other parts of the prosecution's case is a matter for the jury." Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009) (citation omitted). Second, even if an identification is improperly suggestive, the witness's identification of the suspect is still admissible if the identification has "independent reliability". Diaz, 986 F.3d at 207 (citation omitted).

Where a witness to a crime is shown a single photo of a known suspect, the procedure is "impermissibly suggestive". Id. This principle does not apply, however, to situations where a witness is shown images of the actual perpetrator at the scene of the crime and asked whether the witness knows the person in the images.

Here, the identification procedure did not "give rise to a very substantial likelihood of irreparable misidentification." Sexton v. Beaudreaux, 585 U.S. 961, 965 (2018) (citation omitted). The fire marshal did not use an identification procedure that was either suggestive or unnecessary. Id. The fire marshal showed a resident of the building still photographs and a video taken from the first arson attack on May 13, 2022, and the resident identified the person in the images as the former tenant of Apartment 3C. Law enforcement officers had not yet identified the perpetrator. That is, when the fire marshal

12

showed the witness the images of the perpetrator, the fire marshal did not know the identity of the person in the images. There was no due process violation of the defendant's rights and his motion to suppress is denied.

Dated:    New York, New York
          August 27, 2024

                                    _____
                                         DENISE COTE
                                    United States District Judge